SHARON GLENN *et al.*, on Behalf of Themselves and All Other Employees of the City of Chicago, Plaintiffs-Appellants and Cross-Appellees, v. THE CITY OF CHICAGO *et al.*, Defendants-Appellees and Cross-Appellants.

First District (5th Division)    No. 1—91—0008

Opinion filed December 23, 1993.—Rehearing denied February 16, 1994.

Asher, Gittler, Greenfield, Cohen & D'Alba, Ltd., and Anne M. Burke, both of Chicago (Stephen Feinberg, of counsel), for appellants.

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellees.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiffs, a certified class of approximately 162 current or former career service employees of the City of Chicago (City), brought this action challenging the validity of City of Chicago personnel rule XXVI (Rule XXVI). They seek to reverse the administrative determinations of defendants "correcting" plaintiffs' existing certified career service titles, reducing their salaries and eliminating their accrued seniority. The remedies to which they claim entitlement include compensatory and punitive damages, reinstatement to their previous positions, back pay, prejudgment interest, and injunctive relief.

Pursuant to plaintiffs' motion for summary judgment, the trial court found that Rule XXVI was invalid and plaintiffs were subsequently awarded back pay according to a "redlining" method advanced by defendants that computed back pay by excluding all salary increases that plaintiffs would have earned in their pre-Rule XXVI salary grades. The trial court denied plaintiffs' request for reinstatement to their preclassification positions without an evidentiary hearing and also denied their request for prejudgment interest. Plaintiffs appeal and defendants cross-appeal from the trial court's rulings. For the reasons set forth below, we affirm in part and reverse and remand in part.

FACTS

The six named plaintiffs are career public employees having from

7 to 28 years of service for the City of Chicago. Prior to July 15, 1985, plaintiffs had each accumulated from four to seven years of career service seniority in their respective positions, classifications and pay grades. All plaintiffs in the class had previously been certified and appointed to their respective career service positions by the then acting commissioner of personnel in accordance with section 25.1 of the Municipal Code of the City of Chicago (Municipal Code) (Chicago Municipal Code § 25.1 (1983)) and the personnel rules promulgated thereunder. Plaintiffs each received a form letter from the commissioner of personnel in June 1985 announcing that their respective positions were being reclassified pursuant to personnel rule XXVI. That letter notified the plaintiffs that effective in July 1985 they would be appointed to a new position with seniority to begin running from the date of such new appointment.

On August 2, 1985, plaintiffs filed this suit challenging the validity of personnel rule XXVI and the reclassification undertaken pursuant to that rule. In count I, plaintiffs averred that they and 250 similarly situated employees were simultaneously "demoted or transferred to different jobs in the career service having lesser wages and benefits and/or resulting in complete loss of accumulated seniority for purposes of lay-off." Plaintiffs further alleged that defendants simultaneously promoted approximately 350 nonplaintiff City employees under Rule XXVI into either positions previously held by plaintiffs or into vacant positions of increased pay. Plaintiffs sought a declaration that Rule XXVI was invalid because it violated section 25.1 of the Municipal Code of the City of Chicago and was inconsistent with the provisions, spirit and intent of that section. The plaintiffs asked that all actions taken under Rule XXVI be declared null and void and that they be restored to their former positions and receive compensatory damages.

In count II, plaintiffs alleged defendants had wilfully, wantonly and in bad faith enacted and implemented Rule XXVI to deprive them of their career service employment rights. Plaintiffs averred that Rule XXVI was devised and implemented to further defendants' political patronage goals, and was designed to allow the City administration to noncompetitively promote current employees favored by the administration and hire new employees selected by the administration. Plaintiffs further alleged that there were no valid administrative reasons why they could not have been assigned duties commensurate with their job titles instead of being reclassified into lower titles. This count asked for punitive as well as compensatory damages.

Counts III and IV alleged violations of plaintiffs' Federal and

State constitutional rights. Plaintiffs voluntarily dismissed counts III and IV. As such, these counts are not at issue in this appeal.

Both sides separately moved for summary judgment on count I. The trial court denied defendants' motion and subsequently, on August 29, 1989, entered summary judgment in favor of plaintiffs on that count for liability only. The trial court did not reach the factual issue involved in determining whether the reclassification was undertaken by defendants in good faith. Rather, the trial court ruled upon the invalidity of Rule XXVI, which it found to be in conflict with the entire career service system. In so ruling, the trial court noted the potential for abuse under Rule XXVI. The trial court reasoned that under this rule, a certified employee could be directed by his or her supervisors to perform duties outside of those of the position to which that employee was certified and appointed. Then in a subsequent reclassification, which only looks to the duties an employee is actually performing, the employee could be reclassified into a lower position with resultant loss of pay and seniority, without the protection provided by the career service system. Defendants' cross-appeal challenges this ruling.

Before granting summary judgment to plaintiff on count I, the trial court dismissed count II of plaintiffs' complaint pursuant to defendants' motion to dismiss. The trial court ruled that defendants were absolutely immune from any liability arising from the enactment of Rule XXVI under section 2—205 of the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1989, ch. 85, par. 2—205) (Tort Immunity Act), and consequently dismissed those allegations in count II pursuant to section 2—619 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—619). The trial court then dismissed the remaining allegations of count II pursuant to section 2—615 (Ill. Rev. Stat. 1989, ch. 110, par. 2—615), because those allegations failed to state a cause of action. In making its ruling, the court noted that count II could also have been dismissed because the allegations of malice contained in the complaint were insufficient to remove it from the Tort Immunity Act. Plaintiffs appeal the trial court's order dismissing this count.

On December 27, 1990, a new trial judge who succeeded the original trial judge in this cause considered the issues pertaining to remedies. This judge denied plaintiffs' motion for an evidentiary hearing to determine the remedies to be granted and summarily entered final judgment. The successor judge enjoined the city from reducing any employee's salary pursuant to Rule XXVI, but denied plaintiffs' request for prejudgment interest and for reinstatement with seniority to their former career service titles and pay grades.

Regarding back pay, the successor judge awarded plaintiffs relief according to the "redlining" method advanced by the defendants. Using this method, the plaintiffs were awarded the difference between what they had earned in their reclassified positions and what they would have earned if their salaries had been frozen or "redlined," rather than decreased, when they were reclassified. This method of computing back pay excludes all subsequent salary increases, including annual percentage and service longevity increases, which the plaintiffs would have earned in their pre-Rule XXVI classifications. The successor judge reasoned that this method was appropriate on the grounds that the original trial judge's basis for finding Rule XXVI invalid was that it permitted salaries to be reduced. Under the court's order, plaintiffs would continue to earn no less than their frozen pre-reclassification salaries until the salary corresponding to their reclassified title, grade and seniority became equal to or exceeded their frozen pre-reclassification salaries. Plaintiffs appeal this ruling.

OPINION

On appeal, plaintiffs contend that the trial court erred in (1) dismissing count II of their complaint; (2) using the "redlining" method to compute the amount of back pay; (3) refusing to award prejudgment interest; and (4) denying their request for reinstatement to their preclassification titles and salary grades. In their cross-appeal, defendants contend that the trial court erred in finding Rule XXVI invalid on the grounds that it conflicts with the career service system established in the Chicago Municipal Code and the personnel rules promulgated thereunder. Since the resolution of the issues raised in the primary appeal are contingent upon the determination of the issue raised in defendants' cross-appeal, namely, whether Rule XXVI is valid, we will first address defendants' cross-appeal.

Rule XXVI was promulgated in June 1985 and became effective as of July 15, 1985. The rule provides in pertinent part:

"*Section 1—Correction of Classification*

The Commissioner of Personnel shall, upon the request of a department head, or upon his or her own initiative, analyze the duties of a class of positions in a department and the duties actually performed by any person in such class of positions. If, upon such analysis, the Commissioner of Personnel finds that any person with Career Service status in such class of positions is improperly classified in that the person is not performing a sufficient portion of the duties of such class of positions, and is properly classified in another class of positions ('new position'),

the Commissioner of Personnel shall cause such person to be reclassified from the class of positions now held ('previous position') to the new position. If the new position is in the Career Service, the employee shall have Career Service status in the new position.

A reclassification hereunder shall be deemed to be an appointment to the new position as of the effective date of the reclassification and no person reclassified hereunder shall receive credit for service rendered in the previous position in the new position, except for the purpose of determining salary as is required in the Regulations Governing The Administration Of The Compensation Plan And Employee Benefits For Classified Positions Set Forth In The Annual Appropriation Ordinance. An employee reclassified hereunder who previously held and accrued Career Service seniority in the new position, shall receive credit for such seniority, so long as the employee is entitled to continuous service credit for such previous service. Reclassification as provided for in this Section shall have priority over appointments from employment lists as provided in Rule VII, Employment Lists and Transfers. Reclassification as provided for hereunder may not be utilized as or in lieu of disciplinary action provided for in Rule XVIII."

The remainder of the rule includes provisions requiring notice to an employee prior to reclassification and for the review of the reclassification if the employee believes such reclassification is unwarranted.

In arguing the invalidity of Rule XXVI, plaintiffs urge, as they successfully did below, that this rule conflicts with provisions contained in section 25 of the Municipal Code and with City of Chicago personnel rules XII and XVIII. We disagree.

It is "axiomatic that the authority of an administrative agency to adopt rules and regulations is defined by the statute creating that authority, and such rules and regulations must be in accord with the standards and policies set forth in the statute." (*Popejoy v. Zagel* (1983), 115 Ill. App. 3d 9, 11, 449 N.E.2d 1373.) As such, a civil service commission, or in this case the department of personnel, is created by and receives its powers from the legislature and must accordingly exercise its powers in subordination to those rules established by the legislature. 15A Am. Jur. 2d *Civil Service* § 20, at 29 (1976).

Section 25.1—2 of the Municipal Code establishes the department of personnel and the office of commissioner of personnel. This section gives the commissioner of personnel wide-ranging powers with respect to the administration of the career service system and makes the commissioner responsible for the general management and control of the department. Chicago Municipal Code § 25.1—2 (1983).

Under these provisions, the commissioner is authorized to

develop rules for the certification of career service employees and for the establishment of eligible lists from which appointments and promotions are to be made. (Chicago Municipal Code §§ 25.1—5(3), (4), (5) (1983).) The commissioner is further directed to issue rules providing "[f]or lay-offs in the career service, by reason of lack of funds or work, or abolition of a position, or material change in duties or organization, and for reemployment of employees so laid off." (Chicago Municipal Code § 25.1—5(10) (1983).) Finally, section 25.1—5(15) authorizes the commissioner to issue rules "[f]or such other policies and administrative regulations, not inconsistent with this law, as may be proper and necessary for its enforcement." Chicago Municipal Code § 25.1—5(15) (1983); see *City of Chicago v. State & Municipal Teamsters* (1984), 127 Ill. App. 3d 328, 468 N.E.2d 1268 (discussing powers granted to commissioner of personnel by Municipal Code).

We especially note that under section 25.1—5(1) of the Code, the commissioner of personnel is explicitly given the authority to issue personnel rules "[f]or the preparation, maintenance and revision of a position classification plan for all positions in the *** career service." (Chicago Municipal Code § 25.1—5(1) (1983).) We also note that section 25.1—10, which "grandfathers" employees who filled positions encompassed by the career service at the time of the ordinance's adoption, provides that "[n]othing herein shall preclude the reclassification or reallocation as provided by this chapter of any position held by such incumbent." Chicago Municipal Code § 25.1—10 (1983).

■ Considering the broad powers granted under the above-cited provisions of the Municipal Code, personnel reclassification, as detailed in Rule XXVI, cannot be considered *per se* contrary to the City's career service system. Section 25.1—5(1) vests the commissioner with the explicit authority to issue rules regarding the preparation, maintenance and revision of a classification system (Chicago Municipal Code § 25.1—5(1) (1983)), and such authority necessarily includes the authority to correct errors under the system. (See *People ex rel. McKeown v. Hurley* (1951), 343 Ill. App. 413, 99 N.E.2d 355.) In addition, the very same provision that vests career service status to "grandfathered" employees in place at the time of the adoption of the ordinance provides for the right of the commissioner to reclassify or reallocate without mention of career service status. Moreover, there are no provisions in the career service ordinance that purport to protect salary or seniority rights in the event of an otherwise valid reclassification. See *Charles v. Wilson* (1964), 52 Ill. App. 2d 14, 201 N.E.2d 627 (where none of the rights of plaintiffs under civil service

status were affected by general orders and reorganization of police department, those orders and resulting police power were within supervisory authority of police superintendent); 15A Am. Jur. 2d *Civil Service* § 52, at 69 (1976) (absent statutory provisions detailing when employee may be discharged, suspended or demoted, employee lacks protection and may be discharged or suspended without cause).

Thus, it is clear that the career service ordinance on its face does not seek to bar reclassification. Plaintiffs, however, contend that a reclassification that does not seek to preserve wages and seniority is inherently inconsistent with career service since it can provide a back door through which the protections offered by the career service may be circumvented. As shall be more fully discussed below, such attempted abuse of the career service ordinance can be policed and protected at the implementation level without necessitating that the entire process be overturned and the regulatory design for reclassification invalidated.

We recognize that a fundamental purpose of a civil service system is to remove employment from the patronage system. (*People ex rel. Akin v. Kipley* (1897), 171 Ill. 44, 58-59, 49 N.E. 229.) Instead, it seeks to offer the employee the inducement of promotion for conscientious, faithful, honest and efficient service. (*People ex rel. Williams v. Errant* (1907), 229 Ill. 56, 61, 82 N.E. 271; *People ex rel. Kenny v. Fornof* (1951), 343 Ill. App. 73, 98 N.E.2d 126; see also 62 C.J.S. *Municipal Corporations* § 737, at 1510-11 (1949).) "The evils, sought to be remedied by legislation of this character, are well known and well understood. These evils are such as grow out of what is generally called 'the spoils system' ***. *** [And, they] have been fitly characterized as inefficiency, extravagance *** and political assessments." *People ex rel. Akin v. Kipley*, 171 Ill. at 58-59.

The need to protect career service employees from layoffs and demotions made solely on the basis of the political patronage goals of the controlling administration, however, must be balanced against the corresponding need of that administration to implement measures designed to save costs and promote greater efficiency in government administration. "Stated otherwise, civil service was not established for the sole benefit of public employees. In fact, *** the primary purpose of civil service is to enable state, county, and municipal governments to render more efficient services to the public by enabling them to obtain efficient public servants." (15A Am. Jur. 2d *Civil Service* § 1, at 6 (1976).) In this vein, an administration may reclassify employees, or even abolish positions and lay off workers, if such steps are taken in good faith to promote greater economy and efficiency. (See, *e.g., Altman v. Health & Hospitals Governing Comm'n*

(1980), 91 Ill. App. 3d 498, 414 N.E.2d 1091.) As the appellate court stated in *Worthen v. Secretary of State* (1987), 160 Ill. App. 3d 325, 337, 513 N.E.2d 475:

> "It is certainly true that employee positions may be abolished for reasons of economy and efficiency or as part of a material reorganization. The Secretary [of State] normally has the right to dispense with certain services it deems too expensive, and to act accordingly to provide more efficient services."

This policy allowing reclassification recognizes that an administration should not be unduly hampered in the performance of its managerial responsibilities. (*People ex rel. Kenny v. Fornof*, 343 Ill. App. at 91 (" 'the purpose of civil service legislation was to protect efficient public employees from partisan political control, ... it was not designed to prevent a city from undertaking in good faith a reorganization of a municipal department in order to promote effectiveness and economy. [Citations.]' ").) The reclassification of personnel allows the City in the ordinary course of business to meet its changing personnel needs (*Altman v. Health & Hospitals Governing Comm'n*, 91 Ill. App. 3d at 502-03), and is in fact consistent with the Code's stated need for a flexible personnel system. *Hoffman v. Board of Fire & Police Commissioners* (1980), 86 Ill. App. 3d 505, 507, 408 N.E.2d 98 ("[f]lexibility in personnel matters is necessary for the efficient operation of a municipal corporation"); *People ex rel. Kenny v. Fornof*, 343 Ill. App. at 90-91.

The expressed general purpose of the City's career service system is consistent with both of these fundamental goals of a career service system. Section 25.1—1 of the Chicago Municipal Code provides:

> "It is the general purpose of this ordinance, and it is necessary in the public interest, to establish a system of personnel administration that meets the social, economic, and program needs of the people of the city of Chicago, to provide for a professional and progressive merit system for employment, and to insure flexible career service within the city of Chicago." (Chicago Municipal Code § 25.1—1 (1983).)

(See *Messina v. City of Chicago* (1986), 145 Ill. App. 3d 549, 558, 495 N.E.2d 1228 ("purpose of the city's career service is to promote job security which will ensure the development of a cadre of experienced employees and promote professionalism in city departments").) Thus, the protection of the public good, as well as that of individual employees, is recognized.

Plaintiffs appear to contend, however, that the reclassification system is invalid if it does not protect the seniority and salary of the reclassified job holder. In effect, they would urge that reclassification

must be predicated upon the relative seniority of the job holders who are being reclassified and that regardless of reclassification, their existing salaries must be maintained.

■ However, to require that seniority and wages be protected in the event of reclassification would greatly dilute and undercut the economic and administrative reform which would warrant good-faith reclassification in the first instance. While seniority is significant to the values of career service, especially with regards to layoffs, the two terms are not synonymous. Rule XXVI makes no provision for, nor even mention of, an employee's seniority. As we have previously pointed out, neither the general purpose section of the career service ordinance, nor any of its specific provisions for that matter, purport to create, guarantee, or seek to insure employee seniority rights in the context of reclassification. Rather, these provisions seek to implement a merit system that does not unnecessarily eliminate the values of economy, efficiency and flexibility in government administration. As the court stated in *People ex rel. Kenny v. Fornof*, 343 Ill. App. at 90-91:

> "The pertinent inquiry is whether some or any of the duties and responsibilities of a civil service position may be transferred and assigned as functions of a new position created in good faith without intent to evade or circumvent the civil service law. To hold that such a transfer cannot be effected would be tantamount to determining that civil service employees have a vested right to the continued performance of any duties and responsibilities once assigned to them. *** The courts of this and other states have uniformly held that such transfers of functions and duties *** may be made *** [and] are not contrary to the letter or spirit of the civil service laws."

Plaintiffs contend that while the career service system may not explicitly require the preservation of seniority and wages in the event of reclassification, Rule XXVI should be interpreted in conjunction with City of Chicago personnel rule XII, which does require that the seniority of employees be considered when they are laid off.

This rule, which like Rule XXVI was promulgated by the commissioner, provides in pertinent part:

> "In the absence of sufficient work or funds, or upon abolition of a position because of a change in duties associated with it, or because of a change in organizational structure, reductions in force, including layoffs, may be made.
>
> * * *
>
> When employees with Career Service status are laid off, such

lay-off shall be made according to Career Service seniority in the class from which lay-offs are to be made within the department. If two or more employees have equal Career Service seniority, the department head shall determine the order of layoff of such employees based on appropriate job-related factors."

Unlike Rule XXVI, Rule XII does require that employees be laid off in order of seniority. However, this same seniority restriction has not been adopted or implemented with respect to the reclassification of an employee. If the City or the commissioner of personnel desired such a seniority restriction on the reclassification of employees, it could have easily added that language to Rule XXVI or could have expanded Rule XII to cover reclassifications.[1]

Thus, the right to seniority under Rule XII is the creature of a specific regulation governing only in the context of layoffs and does not extend to Rule XXVI, which specifically provides for the right to reclassify to further efficiency and economy in government. To impose upon the reclassification process an inflexible need to protect salaries and seniority by judicial fiat would be unwarranted. Preferably, the function of the court should be to monitor abuse of that process where reclassification is undertaken for motives other than to promote greater efficiency and economy.

For similar reasons, we find unpersuasive plaintiffs' reliance on personnel rule XVIII, which covers disciplinary actions. That rule provides that career service employees may be disciplined only for cause. The rule specifies four possible disciplinary actions, including demotion which is "the reduction of the grade or class of employment and corresponding permanent reduction in salary or wages."

■ The clear purpose of this rule is disciplinary, and not to provide for the reallocation of existing city personnel resources. To engraft a disciplinary action rationale on Rule XXVI based upon Rule XVIII would negate the clear thrust and import of Rule XXVI. (See *Williams v. City of Chicago* (N.D. Ill. 1991), No. 91 C 1821.) This interpretation would substantially weaken Rule XXVI and would incorrectly restrict reallocative personnel initiatives to instances where the employees involved were also subject to disciplinary actions. See 3 E. McQuillin, Municipal Corporations § 12.132, at 614 (3d ed. 1990) ("[w]hen done in good faith, and under the authorization of law, reduction or demotion of municipal officers and employees in

---

[1] We note, according to the City, that subsequently, since 1986, such protection was largely extended to seniority rights even in the context of reclassification under explicitly negotiated collective bargaining agreements between the City and various labor unions which collective bargaining agreements were then enacted as ordinances by the city council.

rank or grade is valid, as where it is done on grounds of economy or efficiency, or for the purpose of disciplining the officer or employee, or for some other legitimate reason").

Thus, neither Rule XII, covering layoffs, nor Rule XVIII, which addresses demotions, controls reclassification when such reclassification is warranted. As pointed out, to inductively extend seniority and salary protection requirements to control the reclassification process would undercut and impede the legitimate goals of otherwise properly undertaken reclassification procedures designed to promote better government administration. Where, on the other hand, reclassification is unwarranted and is undertaken in bad faith, such "reclassification" could then arguably constitute a demotion and would then be subject to the explicit provisions of Rule XVIII.

We therefore conclude that the trial court erred in determining that Rule XXVI was invalid *per se* because that rule is not inconsistent with the purpose or the express provisions of the career service system. Moreover, Rule XXVI is not fatally inconsistent with personnel rules XII and XVIII as those rules of coordinate authority address personnel maneuvers other than reclassification which involve different policy considerations.

Although we have concluded that Rule XXVI was not *per se* invalid as a matter of law, it is clear that its implementation may be invalidated if exercised in bad faith. Such a determination, however, must be by its very nature an evidentiary one, necessarily based on factual conclusions.

There is substantial precedent that actions taken pursuant to an otherwise valid personnel regulation are improper when the regulation is used as a mere subterfuge to reach a result which would otherwise be unlawful if its true purpose were exposed. (See *Worthen v. Secretary of State* (1987), 160 Ill. App. 3d 325, 338, 513 N.E.2d 475, citing Annot., 87 A.L.R.3d 1165 (1978) ("[l]ack of good faith may be established by the fact of a subterfuge or pretended abolition of positions, lack of economic justification for the abolition, or, to a lesser extent, political motivation"); see also *Chestnut v. Lodge* (1966), 77 Ill. App. 2d 281, 288, 222 N.E.2d 36 (bad faith described as "a mixture of motive and result and exists where an imperfect discharge or layoff, which fails to meet the statutory tests or the requirements of the rules, appeared to be politically motivated"); *Hearn v. City of Gainesville* (11th Cir. 1982), 688 F.2d 1328, 1334 ("bad faith may be proved by a showing that the duties of the position were assigned to another person after the position was eliminated").) "Good faith, on the other hand, may be established upon a showing that the abolition was part of a reorganization to further economy and efficiency, and

was accomplished in compliance with code or statute." *Worthen v. Secretary of State*, 160 Ill. App. 3d at 338, citing Annot., 87 A.L.R.3d 1165 (1978).

On point is *People ex rel. Jacobs v. Coffin* (1918), 282 Ill. 599, 610, 119 N.E. 54. There, the Illinois Supreme Court established that while an employer operating under a civil service system may in good faith abolish a position, the employer may not, as a mere pretense, abolish the position for the purpose of unlawfully discharging one employee without cause to substitute another employee in his place. (*People ex rel. Jacobs v. Coffin*, 282 Ill. at 610. See also *People ex rel. Byrnes v. Stanard* (1956), 9 Ill. 2d 372, 137 N.E.2d 289 (which like *Jacobs* involved the replacement of a civil service employee with a noncivil service employee who performed duties identical to those of his predecessor).) In both *Jacobs* and *Byrnes*, the court looked to the employers' motivation in the personnel actions taken and found them to be invalid where the purpose for the action was to circumvent civil service rules. Compare *Altman v. Health & Hospitals Governing Comm'n*, 91 Ill. App. 3d at 502-03 (in which the court found no bad faith in layoffs where the "uncontested motive and result of the Commission's action was to save money").

Although broadly defined, the term "reorganization" is "not an enchanted blanket that can be used to cover improper agency action." (*Cobb v. Department of Labor* (Fed. Cir. 1985), 774 F.2d 475, 477.) Rule XXVI does not provide an absolute right to demote or lay off employees. To lay off an employee, the requirements of Rule XII would have to be met and the procedures enumerated therein followed; to discipline an employee through demotion, the requirements of Rule XVIII would have to be met and the procedure enumerated therein followed. (See *Tamimie v. Glass* (1973), 15 Ill. App. 3d 1, 303 N.E.2d 17.) While reclassifications may be necessary to promote the goals of departmental efficiency, economy and fiscal responsibility as defendants have contended, such reclassifications cannot be done arbitrarily to circumvent existing personnel rules in order to achieve desired political goals. *People ex rel. Jacobs v. Coffin*, 282 Ill. at 610-11; see also *People ex rel. Byrnes v. Stanard*, 9 Ill. 2d at 377-78; *People ex rel. Gillespie v. Bundensen* (1934), 277 Ill. App. 169.

■ In this case, no such factual determination was made by the trial court. We therefore reverse and remand this cause to the trial court. Since we have concluded that this case must be remanded, the question concerning the propriety of remedy is at best premature. However, in the event that upon further proceedings the question concerning the appropriate remedy becomes viable, we briefly comment upon that issue.

As we previously discussed, the trial court computed plaintiffs' back pay according to a "redlining" method. Under this method, plaintiffs were awarded the difference between what they had earned in their reclassified positions and what they would have earned if their salaries had been frozen or "redlined," rather than decreased, when they were reclassified. As such, all salary increases that plaintiffs would have earned in their pre-Rule XXVI classifications were not included in the award of back pay.

■ The rule is clear that, when an employee is wrongfully separated from his position, he is entitled to a back pay award that would make him whole, "meaning that it should put the claimant in the position he or she would have been in respecting salary, raises, sick leave, vacation pay, pension benefits and other fringe benefits, but for the discriminatory act." (*Clark v. Human Rights Comm'n* (1986), 141 Ill. App. 3d 178, 182, 490 N.E.2d 29.) Such employees have traditionally been awarded back pay commensurate with the salary for the position of which they were deprived. (See, *e.g.*, *Clark v. Human Rights Comm'n*, 141 Ill. App. 3d at 182; *People ex rel. Lasser v. Ramsey* (1959), 23 Ill. App. 2d 100, 104-05, 161 N.E.2d 690; see also *People ex rel. Polen v. Hoehler* (1950), 405 Ill. 322, 90 N.E.2d 729.) Furthermore, back pay has been held to include interim wage increases granted to other employees in the absence of evidence that the individual claimants would not have merited such increases. See *Golay & Co. v. NLRB* (7th Cir. 1971), 447 F.2d 290.

As such, if defendants are found to have acted improperly, plaintiffs would be entitled to full back pay, including any increases which have occurred since their reclassifications. (See *Clark v. Human Rights Comm'n*, 141 Ill. App. 3d at 183-85 (trial court erred by setting plaintiff's back pay at the level of average compensation; appellate court remanded for hearing to determine what plaintiff would have earned but for defendant's acts, with instructions that plaintiff first advance his theory of likely earnings, including salary increases, at which time burden shifts to defendant to submit evidence that actual earnings would likely have been less); see also *Koyen v. Consolidated Edison Co.* (S.D.N.Y. 1983), 560 F. Supp. 1161 (wrongfully discharged employee entitled to back pay including salary increases he would have received if not wrongfully discharged).) As the court noted in *Thaxton v. Walton* (1985), 106 Ill. 2d 513, 518, 478 N.E.2d 1350, " '[i]n order to insure real protection to a civil service employee, it is necessary that when it appears that he has been illegally deprived of his position, he should be reimbursed for the loss of the salary which accompanies the position.' [Citation.]" To hold otherwise would grant a defendant who acted improperly an

unwarranted economic advantage and, in turn, disadvantage a plaintiff who was wrongfully removed from his position. *Thaxton v. Walton*, 106 Ill. 2d at 518 ("rule which deprives an improperly suspended or discharged employee of the salary he would have earned *** 'makes no sense' "); *Redemske v. Village of Romeoville* (1980), 85 Ill. App. 3d 286, 406 N.E.2d 602 (plaintiff entitled to back pay, even though she was an employee at will at the time of her improper discharge and could have been terminated without cause).

The trial court attempted to justify freezing plaintiffs' back pay to preclassification levels on the ground that the remedy should correspond to the infirmity found in the reclassification rule. Aside from the fact that we have not held the regulation here to be *per se* invalid, we disagree with the approach taken by the court, which would limit the relief to the threshold element, that would have made the rule valid. Once this regulation was declared invalid, a miss is as good as a mile, and the employee would be entitled to full remedy and recourse.

Defendants rely on two cases from other jurisdictions, *Schultz v. Regents of the University of California* (1984), 160 Cal. App. 3d 768, 206 Cal. Rptr. 910, and *Gorecki v. Ramsey County* (Minn. App. 1988), 419 N.W.2d 76, *aff'd* (Minn. 1989), 437 N.W.2d 646, to support use of the redlining method. Those cases, however, are inconsistent with the law of Illinois and are readily distinguishable from this case. In *Schultz*, the court rejected plaintiff's contention that he had a legally enforceable right to step increases because plaintiff failed to present any evidence that he would have been entitled to such increases. In *Gorecki*, the redlining method was statutorily mandated for computing back pay reclassifications; no such provision exists here, however. While there are Chicago city council salary regulations which address the appropriate salary for a properly reclassified employee (see City of Chicago Classification and Pay Plan Resolution § C(4) (employee retains same salary when reclassification is to position of same class grade), § C(5) (if appointed to a lower class grade, employee paid at same step as held in pre-reclassification position)), those sections do not address the issue of back pay to be awarded for improper reclassifications. Consequently, we determine that should there be an ultimate determination in plaintiffs' favor, plaintiffs would be entitled to full back pay, and not back pay computed under the redlining method.

█ The issue of reinstatement is more complex. In cases involving an individual who was wrongly removed from his position, reinstatement is generally an appropriate remedy. (*People ex rel. Jacobs v. Coffin*, 282 Ill. at 611; *People ex rel. Byrnes v. Stanard*, 9 Ill. 2d at 377-

78.) In addition to the fact that some of plaintiffs' former positions may have been abolished, that remedy may require the disruptive displacement of employees currently filling those positions. A court of equity must have latitude to consider the relative benefits and hardships in crafting an appropriate and just remedy. (See *Schnuck Markets, Inc. v. Soffer* (1991), 213 Ill. App. 3d 957, 974, 572 N.E.2d 1169 ("court of equity may grant relief as it deems equitable, and it will not require the doing of an act which will result in little benefit to one but greater hardship to another"); *Davis v. Kurtz* (1988), 165 Ill. App. 3d 417, 421, 518 N.E.2d 1297 ("[i]t is well established that courts of equity have great flexibility in determining appropriate relief in actions before them and may shape remedies to meet the demands of justice in each case, however peculiar").) The factors which enter into the resolution of this issue require factual determinations which should be addressed by the trial court upon remand if it finds that defendants acted improperly.

We now turn to the trial court's dismissal of count II of plaintiffs' complaint. In dismissing count II, the trial court, relying on *Carter v. City of Elmwood* (1987), 162 Ill. App. 3d 235, 515 N.E.2d 415, determined that defendants were immune with respect to liabilities arising from the enactment and implementation of Rule XXVI under section 2—205 of the Tort Immunity Act. (Ill. Rev. Stat. 1989, ch. 85, par. 2—205.) Plaintiffs here agree that section 2—205 would apply, but contend that the immunity granted under that section does not extend to cover wilful and wanton conduct. They argue that *Carter v. City of Elmwood*, a third district decision which held that section 2—205's grant of immunity was absolute, was wrongly decided and urge that we instead follow the second district's decision in *Madonna v. Giacobbe* (1989), 190 Ill. App. 3d 859, 546 N.E.2d 1145, where the court determined that the immunity conferred under section 2—205 did not offer protection for "acts resulting from corrupt or malicious motives." 190 Ill. App. 3d at 869.

In 1965, the legislature enacted the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1965, ch. 85, par. 1—101 *et seq.*). This Act imposed various conditions and limitations on the tort liabilities of local governmental units. (*Boyles v. Greater Peoria Mass Transit District* (1986), 113 Ill. 2d 545, 499 N.E.2d 435.) Generally, municipalities and their employees are not liable for the failure to enact, enforce or comply with ordinances. 63 C.J.S. *Municipal Corporations* § 769 (1950).

■ Section 2—205 of the Tort Immunity Act provides that a "public employee is not liable for an injury caused by his adoption of, or failure to adopt, an enactment, or by his failure to enforce any law."

(Ill. Rev. Stat. 1989, ch. 85, par. 2—205.) The language of this provision contains no qualification of the immunity conferred for the enactment of any law. The absence of language excluding coverage for wilful and wanton conduct was noted by the court in *Carter v. City of Elmwood*:

> "Unlike other sections of the Tort Immunity Act (see Ill. Rev. Stat. 1985, ch. 85, par[s]. 2—201[, 2—202]), section 2—205 contains no language relating to wilful or wanton misconduct. This triggers the familiar maxim of construction that the inclusion of one is the exclusion of all else. Because the Illinois legislature could have easily inserted the 'wilful and wanton' language in section 2—205, but did not, the only logical conclusion can be that the immunity conferred under section 2—205 is absolute." *Carter*, 162 Ill. App. 3d at 237.

See also *Mahoney Grease Service, Inc. v. City of Joliet* (1980), 85 Ill. App. 3d 578, 406 N.E.2d 911 (determining that section 2—205 of the Tort Immunity Act barred count of plaintiff's complaint which alleged wilful and wanton misconduct by individual defendants).

That the grant of immunity contained in section 2—205 is absolute is further supported by this court's similar interpretation of section 2—206. Section 2—206 provides:

> "A public employee is not liable for an injury caused by his issuance, denial, suspension or revocation of or by his failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order or similar authorization where he is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." Ill. Rev. Stat. 1989, ch. 85, par. 2—206.

This section, which like section 2—205 does not contain language excepting wilful and wanton conduct, has similarly been interpreted to grant absolute immunity. *Foster & Kleiser v. City of Chicago* (1986), 146 Ill. App. 3d 928, 497 N.E.2d 459 (section 2—206 grants absolute immunity to public employees for damages caused by the issuance, denial or revocation of any permit). See also Baum, *Tort Liability of Local Governments and Their Employees: An Introduction to the Illinois Immunity Act*, 1966 U. Ill. L.F. 981, 1004 ("malicious acts will not be actionable if they fall within specific immunities granted by sections of the Immunity Act other than section 2—201. Many of these sections are categorical in their language and appear to leave no room for exceptions, even where good faith is lacking"); *Luber v. City of Highland* (1986), 151 Ill. App. 3d 758, 502 N.E.2d 1243 (holding that sections 4—102 and 4—107 of the Tort Immunity Act covering the enforcement of criminal laws by police officers operated to bar plaintiff's claim for wilful and wanton acts since those sections do not

contain language specifically excluding immunity for wilful and wanton conduct).

A finding that the grant of immunity under section 2—205 is absolute would also be consistent with the "strong public policy concerns which dictate that public officials be shielded from liability in civil actions based upon their vote, in the exercise of discretion, either for or against any legislation." (*Carter v. City of Elmwood*, 162 Ill. App. 3d at 236; see also *Mahoney Grease Service, Inc. v. City of Joliet*, 85 Ill. App. 3d at 581-82.) This policy recognizes that officials should be protected "when making decisions assessing the public's needs and that such decisions should be made without fear of personal liability or the second-guessing of courts and juries." *Idlehour Development Co. v. City of St. Charles* (1980), 88 Ill. App. 3d 47, 52, 409 N.E.2d 544; see *Emulsicoat, Inc. v. City of Hoopeston* (1981), 99 Ill. App. 3d 835, 425 N.E.2d 1349 (comparing differences in language used in section 2—202 and section 2—205 in concluding that individual defendants would not be shielded from liability for their own direct actions which were wilful and wanton under section 2—202, but would be shielded from all acts which were decisional under section 2—205 regardless of whether such acts were wilful and wanton).

In view of the language of section 2—205 when compared to other provisions of the Act, similar interpretations of other sections, and the recognized public policy of providing immunity for actions like those encompassed by section 2—205, we determine that the grant of immunity contained in section 2—205 is absolute. Consequently, the trial court properly dismissed count II of plaintiff's complaint.

For the foregoing reasons, we reverse the trial court's grant of summary judgment in favor of plaintiffs on count I of their complaint and affirm the trial court's dismissal of count II of the plaintiffs' complaint. We remand this cause for further proceedings on count I of plaintiffs' complaint.

Affirmed in part; reversed and remanded in part.

MCNULTY and COUSINS, JJ. concur.